[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11509

_____

D.C. Docket No. 1:13-cv-21604-KMW


FLORIDA INTERNATIONAL UNIVERSITY BOARD OF TRUSTEES,

Plaintiff - Appellant,

versus

FLORIDA NATIONAL UNIVERSITY, INC.,
d.b.a. Florida National University Online Learning Campus,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 26, 2016)

Before MARCUS, DUBINA and MELLOY,[*] Circuit Judges

_____

[*] Honorable Michael J. Melloy, United States Circuit Judge for the Eighth Circuit, sitting by designation.

MARCUS, Circuit Judge:

At issue in this trademark case is whether Florida National University, Inc. ("FNU"), infringed the trademark rights of Florida International University ("FIU") in its registered trademark "FLORIDA INTERNATIONAL UNVERSITY" or committed unfair competition when FNU changed its name from "Florida National College" to "Florida National University."  After thorough review and with the benefit of oral argument, we affirm the district court's entry of final judgment in favor of FNU on all claims.

## I.

## A.

The parties stipulated to the following basic facts.  Founded by the Florida legislature in 1965, FIU is a public body corporate of the State of Florida and part of Florida's State University System.  FIU has two major campuses in South Florida, including the 342-acre Modesto A. Maidique Campus in west Miami-Dade County, which features student residences, an eight-story library, a nature preserve, an athletic stadium, and an art museum.  FIU is South Florida's only public research university, offering over 180 bachelor's, master's, and doctoral degree programs, as well as a wide variety of non-degree and certificate programs. Its programs include bachelor's degrees in accounting, business administration, criminal justice, health services administration, and nursing, and master's degrees

in business administration. FIU serves "traditional" college-bound students, who directly enroll in FIU's bachelor's program after graduating from high school. It has grown to become one of the nation's largest public four-year universities, with over 50,000 full-time students enrolled in the fall of 2012. In 2013, FIU awarded 3,033 masters degrees and 8,460 bachelor's degrees.

FIU owns a "word" trademark for its name, "FLORIDA INTERNATIONAL UNIVERSITY," and three "design" trademarks featuring the acronym "FIU":







It has spent substantial resources, time, and effort marketing and promoting its marks locally, nationally, and internationally. FIU promotes its brand through various publications, including FIU Magazine; its website, www.fiu.edu, which it has operated since 1989; advertisements on the radio and the Internet; campus activities; public service and community outreach activities; and its athletic programs.

FNU is a for-profit, private higher education institution headquartered in Hialeah, Florida. It was founded in 1987 by Dr. Jose Regueiro, Dr. Maria C. Regueiro, and Mr. Omar Sanchez, and initially operated under the name "Florida International Institute." At its inception, FNU -- then operating as Florida International Institute -- was accredited to grant associate's degrees as its highest-level offering. In December 1987, FNU changed its operating name from "Florida International Institute" to "Florida International College" in order to reflect the credentials of additional programs it was offering. In March 1989, FIU objected to FNU's name change to Florida International College and filed a trademark infringement action in the United States District Court for the Southern District of Florida. That lawsuit was settled when FIU and FNU stipulated that FNU would change its name from "Florida International College" to "Florida National College."

From 1989 until 2012, FIU and FNU coexisted "very peacefully" without any confusion caused by FNU's use of the name "Florida National College." While operating as Florida National College, FNU obtained several federal and Florida trademarks relating to that name. In 2008, FNU -- still operating under the name Florida National College -- became accredited to offer bachelor's level degree programs, and in December 2011 it became accredited to offer a master's degree in business administration.

4

On March 4, 2012, FNU officially changed its name to "Florida National University."  Now operating under that name, FNU offers one master's degree program, seven bachelor's degree programs, twenty-two associate's degree programs, nine diploma programs, and nine certificate programs.  Out of 2,795 students enrolled in a recent winter term at FNU, nearly half were enrolled in either an Associate of Arts or an Associate of Science program; approximately 20% were enrolled in a developmental program for English as a Second Language; approximately 15% were enrolled in a Bachelor of Arts or Bachelor of Science program; and approximately 1% were pursuing a master's degree in business administration.  FNU currently operates two campuses in Miami-Dade County -- one of which is less than two miles from FIU's main campus -- and also offers online courses.  FNU does not offer on-campus housing, and most of its students commute to school at night after working during the day.  FNU has its own website, www.fnu.edu, and it advertises on the Internet, billboards, television, print media, and the radio.

On June 26, 2012, FNU filed a federal trademark application for the word mark "Florida National University," as well as for a design mark:



FIU has opposed registration of these marks, and the United States Patent and Trademark Office has held the registration in abeyance pending the disposition of FIU's opposition proceeding in the Trademark Trial and Appeal Board. However, FNU has successfully registered these same trademarks with the Florida Department of State Division of Corporations. FNU uses the name "Florida National University" and corresponding logo, as well as the acronym "FNU" to advertise and promote its educational services. It has used and promoted the "Florida National" part of its full name since at least 1989, and considers the "Florida National" brand to represent one of its most important assets.

**B.**

On May 3, 2013, FIU commenced this lawsuit in the United States District Court for the Southern District of Florida against FNU for infringement of FIU's trademarks, asserting six claims for relief: (1) federal trademark infringement under the Lanham Act, 15 U.S.C. § 1114; (2) federal unfair competition, also under the Lanham Act, 15 U.S.C. § 1125(a); (3) Florida trademark dilution and injury to business reputation, Fla. Stat. § 495.151; (4) Florida trademark infringement, Fla. Stat. § 495.131; (5) Florida common law trademark infringement and unfair competition; and (6) cancellation of State of Florida trademark registration, Fla. Stat. § 495.101. FIU sought several forms of relief, including treble damages, disgorgement of wrongful profits, and a permanent

injunction barring FNU from using the name "Florida National University" and the acronym "FNU."

In August 2014, after conducting discovery, the parties filed cross-motions for summary judgment. While the summary judgment motions were pending, the parties continued preparing the case for a bench trial, which was scheduled for December of that year. The parties submitted an extensive list of pretrial stipulations, identified the issues of fact that remained to be litigated at trial, and submitted witness lists. The parties also submitted exhibit lists, motions in limine, and proposed findings of fact and conclusions of law pursuant to the district court's trial scheduling order.

The circumstances surrounding the ensuing procedural history are essential to understand the resolution of this lawsuit. On November 4, 2014, the district court held a status conference in anticipation of commencing a bench trial on December 1, 2014. At the conference, the court directly asked the parties whether they had any additional evidence to present at trial that was not already "covered in the many submissions" they had made to the court. FNU's counsel answered that, in light of the comprehensive submissions of the parties, the court could resolve many of the issues in the case on summary judgment, and could greatly narrow the issues that would be litigated at trial. FIU's counsel took this plan a substantial step further, telling the district court that the parties' evidentiary submissions and

accompanying briefing "would allow [the court] to make the same decision that ultimately [it] could make if [the parties] marched in all these fact and expert witnesses and put them on the stand," and thus that the court would not "learn anything new at trial that [it had] not already seen from both sides."  He further explained that "there are enough undisputed facts that [the court has] a record [from] which [it] could make a summary judgment decision that in essence is going to be a bench trial decision."  FIU's counsel agreed with the approach suggested by FNU's counsel, whereby the parties "could come in and present to [the court] in the form of either a closing or a summary judgment argument," which "would hopefully expedite and consolidate everything."  The district court agreed to conduct a hearing at which time the parties could "sum up" their pleadings "instead of" scheduling a bench trial during which the parties would present live evidence.  But the court acknowledged that if, after that hearing, it determined that "there [was] a genuine issue of fact that need[ed] to be fleshed out," it might ask the parties to present additional evidence.

On December 3, 2014, the court heard oral argument -- in the court's words -- "on cross motions for summary judgment slash bench trial."  FNU's counsel initially suggested that the court, "in the first instance," evaluate the parties' arguments and evidence under the Federal Rule of Civil Procedure 56 standard of review for summary judgment motions, but recognized that some issues "may

require a trial standard" of review.  FIU's counsel responded that he had expected that the court would "tak[e] everything that has been submitted . . . at summary judgment, and in our pretrial stipulation and proposed findings," "treat[] that as the record," and treat the parties' arguments as "essentially a summary judgment argument but also a closing argument type of presentation in a bench trial."  He continued, "as the finder of fact on those issues that FIU and FNU may disagree on factually," the district court would "become a fact finder."  Indeed, FIU's counsel did not plan on calling any witnesses, nor did he see the need for witnesses after the hearing, and thought that the court would be "in a position to make a full and final ruling after today's presentations."  At the conclusion of the hearing, the court said that it understood the parties' views of the record and did not see any "need for live testimony" unless either party felt that it "would like to add to or continue this proceeding."  FIU's counsel agreed with the district court, and FNU's counsel said that he too "would not be adding anything to the record."

## C.

On March 3, 2014, the district court granted FNU's motion for summary judgment and denied FIU's motion for summary judgment in a thorough written opinion.  See Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., 91 F. Supp. 3d 1265 (S.D. Fla. 2015).  After explicating the Rule 56 summary judgment standard of review, the court observed that "in a nonjury case such as this, in which the Court

is the trier of fact and there are 'no issues of witness credibility,' the Court may make factual determinations and draw inferences at the summary judgment stage based on the affidavits, depositions and other evidence in the record, because '[a] trial on the merits would reveal no additional data' nor 'aid the determination.'" Id. at 1273 (alteration in original) (quoting Nunez v. Superior Oil Co., 572 F.2d 1119, 1123–24 (5th Cir. 1978)).

The trial court then addressed each of FIU's six claims -- just as it would have done after a bench trial -- granting judgment in favor of FNU on each one. First, the district court found that FIU had failed to establish that FNU's marks created a likelihood of confusion with FIU's marks, so its trademark claim under the Lanham Act necessarily failed. Next, the court noted that the legal standard for unfair competition under the Lanham Act is "essentially the same" as the likelihood-of-confusion standard under that Act, and, therefore, held that FIU's unfair competition claims were unmeritorious because FIU had failed to establish a likelihood of confusion based on FNU's mark. The court also rejected FIU's claim that FNU committed unfair competition by intentionally attempting to align itself in the public eye with all of Florida's public universities because, in its view, the sole inquiry was whether the public was likely to confuse FNU with FIU.

The court then addressed FIU's Florida trademark dilution claim, which required FIU to prove that FNU's conduct likely diluted its "famous" marks. See

10

Fla. Stat. § 495.151. The court determined that FIU's marks were famous within the meaning of § 495.151. However, it found that FNU had not diluted FIU's marks for essentially the same reasons that it found FNU's marks did not create a likelihood of confusion. Accordingly, the district court granted judgment in favor of FNU on the dilution claim as well. The parties agreed that the Florida trademark infringement and common law infringement claims rose and fell with the federal trademark infringement claim, and that the claim to cancel FNU's Florida trademark registration similarly required FIU to establish a likelihood of confusion. Therefore, the court concluded, because FIU had failed to establish a likelihood of confusion, those claims failed as well.

The court entered final judgment in favor of FNU, and FIU timely appealed.

## II.

At the outset, it is critical that we decide what we are reviewing today -- a summary judgment order or a final judgment entered after a bench trial. Indeed, the applicable standard of review depends precisely on "whether we treat the district court's action as a grant of a summary judgment motion or a trial on a stipulated record," Vetter v. Frosch, 599 F.2d 630, 631 (5th Cir. 1979),[1] and the resolution of the case turns on this issue. FNU claims that the district court's

---

[1] Fifth Circuit decisions issued before the close of business on September 30, 1981, are binding on the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

decision was effectively a decision after a bench trial and, therefore, we ought to apply the deferential "clearly erroneous" standard of review to the district court's factual findings. See Fed. R. Civ. P. 52(a)(6). FIU insists, however, that we treat the district court's decision as a grant of summary judgment and, therefore, review it de novo under the exacting summary judgment standard. See Fed. R. Civ. P. 56(a). We agree with FNU that the district court's opinion is better understood as a decision made after a bench trial and, therefore, its factfinding requires deferential review.

The case first came before the district court on cross-motions for summary judgment. Notably, a district court may grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000) (quotation omitted). In deciding whether a material disputed fact precludes summary judgment, a court generally must "view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Id. (quotation omitted). We review a district court's decision granting summary judgment de novo, Byars v. Coca-Cola Co., 517 F.3d 1256, 1263 (11th Cir. 2008), and will reverse unless "the record taken as a whole

12

could not lead a rational trier of fact to find for the non-moving party," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Many years ago, the former Fifth Circuit observed in dictum that in cases slated for a bench trial where "there are no issues of witness credibility" the district court may conclude "on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact" and grant summary judgment, "even though [its] decision may depend on inferences to be drawn from what has been incontrovertibly proved." Nunez, 572 F.2d at 1123–24. When "there are neither issues of credibility nor controversies with respect to the substance of the proposed testimony," a "trial on the  merits would reveal no additional data," and "[h]earing and viewing the witnesses subject to cross-examination would not aid the [district court's] determination." Id. at 1124. Therefore, the district judge, "as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial." Id. We have since approved of this dictum from Nunez. See Useden v. Acker, 947 F.2d 1563, 1572-73 (11th Cir. 1991). But we explained that, even though the district court may draw inferences against the non-moving party at the summary judgment stage in certain limited circumstances, our standard of review is "unaffected by any inferential conclusions reached below." Id. at 1573 n.14. That is, we still review the district court's summary judgment decision de novo, and "review the evidence and all

13

factual inferences arising from the evidence in the light most favorable to the non-moving party." Id. at 1572.

On the other hand, there are "limited circumstances wherein the district court may treat cross-motions for summary judgment as a trial and resolve the case on the merits." Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs, 775 F.3d 1336, 1345-46 (11th Cir. 2015). In evaluating whether the district court may do so, we consider these critical factors: whether the district court held "a hearing on the motions for summary judgment in which the facts were fully developed"; whether the parties "expressly stipulated to an agreed set of facts"; and whether the record reflects that the parties had "in effect submitted the case to the court for trial on an agreed statement of facts embodied in a limited written record, which would have enabled the [district] court to decide all issues and resolve all factual disputes." See id. at 1346 (quotations and emphasis omitted, alteration adopted). The appellate corollary of this rule is that, in certain circumstances, we will review a decision that on its face purports to be a summary judgment under the more deferential standard applied to a judgment following a bench trial. See Vetter, 599 F.2d at 632-33. Under that standard of review, we still review legal questions de novo, but, importantly, we review factual findings only for clear error, drawing all inferences in favor of the district court's decision. Id. at 632. Review under this decidedly more deferential standard is appropriate when it appears that the

14

parties intended to submit the case to the district court for final resolution, not for summary judgment, and that the district court in fact decided the case on that basis. See id. at 632-33.[2]

In the unique circumstances of this case, we think the district court's decision is better understood as a judgment entered after a bench trial. For starters, the parties "expressly stipulated to an agreed set of facts" and "in effect submitted the case to the court for trial on an agreed statement of facts embodied in a limited written record, which would have enabled the [district] court to decide all issues and resolve all factual disputes." Ga. State Conf. of NAACP, 775 F.3d at 1346. At the November 4th and December 3, 2014 hearings, the parties agreed that the summary judgment submissions, pretrial stipulations, and proposed factual findings constituted the full record before the court and that the presentation of additional evidence or live witness testimony would be unnecessary. FIU's counsel understood the December 3rd presentation to be "essentially a summary

---

[2] Accord, e.g., Allen v. United Mine Workers, 726 F.2d 352, 353 (7th Cir.1984) ("When, as in this case, the trial court with the parties' acquiescence treats the hearing on cross-motions for summary judgment as the trial and enters (as it did) findings of fact and conclusions of law as required in a bench trial . . . , its findings can be overturned on appeal only if they are clearly erroneous."); Wilson v. Block, 708 F.2d 735, 745 n.7 (D.C. Cir. 1983) ("We thus find that the plaintiffs agreed to the disposition of the claim on the written record."); Nielsen v. W. Elec. Co., 603 F.2d 741, 743 (8th Cir.1979) (declining to treat the district court's resolution as a summary judgment where "[t]he record reflect[ed] that both parties treated the proceedings as a trial on the factual issues[,] . . . [and p]laintiff's counsel conceded at oral argument that he presented all available evidence in support of his position"); Starsky v. Williams, 512 F.2d 109, 112 (9th Cir. 1975) (concluding the district court properly resolved factual disputes without holding a trial where "the parties in fact agreed that all of the underlying material facts were those reflected by the written record").

15

judgment argument but also a closing argument type of presentation in a bench trial," and also significantly told the district court that, to the extent that there were material factual disputes between the parties, it could "become a fact finder to that extent." The parties clearly agreed that the district court could treat the stipulated record as a record after a bench trial <u>and</u> resolve factual disputes where necessary.

"Treating this case as a trial on a stipulated record clearly seems more consistent with the district court's actions." <u>Vetter</u>, 599 F.2d at 632. At the November 4 status conference, the district court stated that it would hold a hearing where the parties could "sum up" their pleadings "instead of scheduling a five day trial." And, at the beginning of the December 3 hearing, the court explained that it was conducting a hearing "on cross motions for summary judgment slash bench trial." Thus, the December 3 hearing was "a hearing on the motions for summary judgment in which the facts were fully developed," <u>Ga. State Conf. of NAACP</u>, 775 F.3d at 1346, which was intended as a <u>substitute</u> for (not a possible precursor to) a bench trial.

What's more, the district court's opinion reads far more like a judgment by a factfinder after a bench trial than a summary judgment ruling. While the district court opened with an explication of the Rule 56 summary judgment standard and a citation to the former Fifth Circuit's decision in <u>Nunez</u>, it mischaracterized the <u>Nunez</u> decision as permitting it to "make factual determinations," which <u>Nunez</u>

plainly does not allow a court to do at the summary judgment stage. See Nunez, 572 F.2d at 1123-24 (allowing district court to draw inferences "from what has been incontrovertibly proved"). If the district court intended to draw inferences against the non-moving party and resolve factual disputes -- which plainly it did throughout its opinion -- then it effectively performed the function of conducting a bench trial on a stipulated record, not a summary judgment ruling under the Nunez framework. Moreover, after its opening discussion of the summary judgment standard, the opinion is utterly devoid of any reference to that method of review. Nowhere did the district court find or imply, as we would have expected in an opinion granting summary judgment, that "there is no genuine dispute as to any material fact" or that FNU is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rather, it granted judgment in favor of FNU on FIU's federal trademark claim (as well as its other claims) because FIU had "failed to establish that FNU's mark creates a likelihood of confusion." Thus, it seems to us that the district court effectively conducted a bench trial on a stipulated record, making many critical findings of fact along the way.

Finally, viewing the district court's decision as a judgment rendered after a bench trial is consistent with the substance of FIU's arguments on appeal. In its appellate briefing, FIU cites the summary judgment standard, but does not argue that there were material factual disputes that precluded the district court from

17

granting summary judgment in FNU's favor. Instead, it says, the "overwhelming material evidence" supported its claims, and the district court "should have concluded that FNU's 2012 adoption of Florida National University and FNU constituted trademark infringement, unfair competition, and dilution." Furthermore, and equally significant, FIU does not ask us to remand this case to the district court in order to conduct a trial on the merits; rather, it only asks this Court to reverse the district court's final judgment and remand for the district court to enter final judgment in its favor. Thus, it seems to us that the crux of FIU's argument is that the district court incorrectly assessed the weight of the evidence.

For all of these reasons, we think it more accurate and better to view the district court's decision in this case as the entry of judgment after conducting a bench trial.[3] Accordingly, "we review the district court's conclusions of law de novo and the district court's factual findings for clear error." Tartell v. S. Fla.

---

[3] In Useden, we declined to apply "a relaxed standard of review for all cases in which the district court judge, rather than a jury, would be the ultimate trier of fact were the action to proceed to trial." 947 F.2d at 1572-73. However, none of the three factors that we rely on today -- the parties' consent to allow the district court to find facts and render a final judgment on the stipulated record, the district court's and parties' intent to substitute a final summary judgment hearing for a bench trial, and the appellant only seeking a remand for entry of final judgment in its favor -- was present in Useden. Nothing in Useden suggests that the parties had "in effect submitted the case to the court for trial on an agreed statement of facts embodied in a limited written record, which would have enabled the [district] court to decide all issues and resolve all factual disputes." Ga. State Conf. of NAACP, 775 F.3d at 1346. Moreover, in Useden the appellant challenged the district court's grant of summary judgment to the defendants and, unlike FIU, did not merely urge the appellate court to remand for entry of judgment in its favor. See Useden, 947 F.2d at 1565, 1569.

18

Sinus & Allergy Ctr., Inc., 790 F.3d 1253, 1257 (11th Cir. 2015) (quotation omitted). "'A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, The Ecumenical Order ("Sovereign Military"), 809 F.3d 1171, 1180 (11th Cir. 2015) (quotation omitted) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Holladay v. Allen, 555 F.3d 1346, 1354 (11th Cir. 2009) (quoting Anderson v. Bessemer City, 470 U.S. 564, 574 (1985)) (quotation omitted).

## III.

Under the Lanham Act, 15 U.S.C. § 1114(1), a defendant is liable for trademark infringement if, without consent, he uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" that "is likely to cause confusion, or to cause mistake, or to deceive." Our case law makes it clear that, in order to prevail on a federal trademark infringement claim under § 1114, FIU had to demonstrate (1) that its marks had priority over FNU's marks, and (2) that FNU's marks were likely to cause consumer confusion. See Frehling

Enters., Inc. v. Int'l Select Grp., Inc., 192 F.3d 1330, 1335 (11th Cir. 1999). The parties agree that FIU's marks had priority over FNU's marks, so we need only ask whether the district court clearly erred in finding that FIU failed to establish that FNU's marks created a likelihood of confusion.

We consider seven factors in assessing whether or not a likelihood of consumer confusion exists: (1) the strength of the allegedly infringed mark; (2) the similarity of the infringed and infringing marks; (3) the similarity of the goods and services the marks represent; (4) the similarity of the parties' trade channels and customers; (5) the similarity of advertising media used by the parties; (6) the intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public. Tana v. Dantanna's, 611 F.3d 767, 774-75 (11th Cir. 2010). Of these factors, the type of mark and the evidence of actual confusion are the most important. See Aronowitz v. Health-Chem Corp., 513 F.3d 1229, 1239 (11th Cir. 2008). Notably, we review the district court's findings as to each factor and its ultimate conclusion regarding the likelihood of confusion only for clear error. See N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1220 (11th Cir. 2008). Moreover, a district court's error "in its analysis of one of the subsidiary factors in the likelihood of confusion test is not enough to allow us to overturn the district court's decision." AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1545 (11th Cir. 1986). "Rather, we

must be convinced that the district court's ultimate conclusion -- that the plaintiff established a likelihood of confusion -- is clearly erroneous." Id.

In analyzing the likelihood of confusion in this case, we are also mindful that "sophisticated consumers [of complex goods or services] . . . are less likely to be confused than casual purchasers of small items." Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1361 (11th Cir. 2007); see also Freedom Sav. & Loan Ass'n v. Way, 757 F.2d 1176, 1185 (11th Cir. 1985) ("The sophistication of a buyer certainly bears on the possibility that he or she will become confused by similar marks."). Importantly, the district court recognized that students looking for a college to attend are likely to be relatively sophisticated and knowledgeable because of the nature, importance, and size of the investment in a college education. As one court has observed: "[I]t is hard to imagine a more important or expensive purchase than a college education. The degree of care and thought involved in choosing a college is undoubtedly higher than that required for most purchases." Savannah Coll. of Art & Design, Inc. v. Houeix, 369 F. Supp. 2d 929, 956 (S.D. Ohio 2004).

In its complaint, FIU claimed that four of its trademarks were violated by FNU's name change and adoption of new logos: its word mark for the name "Florida International University," and its three design marks featuring the initials "FIU" in blue and gold alongside a panther or the full name. The district court did

not analyze whether the two schools' logos were confusingly similar, but instead focused on their names and acronyms. On appeal, FIU argues only that FNU's use of its new name and acronym is likely to cause confusion with FIU's word mark and acronym. FIU has thus abandoned any claim that the design marks (which bear no resemblance to each other) are confusingly similar. See Little v. T-Mobile USA, Inc., 691 F.3d 1302, 1306 (11th Cir. 2012) (claims not raised in appellate briefing are deemed abandoned). Accordingly, we analyze only whether FNU's use of its new name and acronym is likely to cause confusion with FIU's word mark and acronym.[4]

### 1. Strength of FIU's Mark

The allegedly infringed mark's strength is the second most important factor in the seven-factor balancing test. Sovereign Military, 809 F.3d at 1182. "The stronger the mark, the greater the scope of protection accorded it[;] the weaker the mark, the less protection it receives." Frehling Enters., 192 F.3d at 1335. Our case law instructs us that a factfinder should assess the strength of a mark in two ways. See id. First, it classifies the mark as "generic," "descriptive," "suggestive," or

---

[4] FIU does not own a separate word mark for the acronym "FIU." But abbreviations of registered trademarks, including "acronyms or abbreviations made up of the first letters of a corporate or business name," are "just as entitled to legal protection as the original full trademark." 1 McCarthy on Trademarks and Unfair Competition § 7:18 (4th ed. 2016). "If the public has come to shorten a trademark into a nickname, then the nickname is entitled to independent legal protection as a mark." Id. FNU does not contest that FIU's acronym is entitled to at least some level of legal protection.

"arbitrary" based on the relationship between the mark and the service or good it describes. Id. Generic marks are the weakest and are not entitled to protection -- they refer to a class of which an individual product is a member (for example, "liquor store" used in connection with the sale of liquor). Descriptive marks describe a characteristic or quality of an article or service (for example, "vision center" denoting a place where glasses are sold). Suggestive marks suggest characteristics of the goods and services and require imaginative effort by the consumer in order to be understood as descriptive (such as "penguin" being applied to refrigerators). Finally, arbitrary marks -- the strongest of the four categories -- bear no relationship to the product (e.g., "Sun Bank" is arbitrary when applied to banking services). Id. Not surprisingly, then, arbitrary marks are the strongest of the four categories. Id. at 1335-36. Then, after categorizing the nature of the mark, the factfinder considers "the degree to which third parties make use of the mark." Id. at 1336. "The less that third parties use the mark, the stronger it is, and the more protection it deserves." Id.

A mark's strength is enhanced if it has "incontestable" status. See id. A mark is "incontestable" if it has been registered for five years with the Patent & Trademark Office ("PTO"), its holder has filed the affidavit required by 15 U.S.C. § 1065(3) with the PTO, and the PTO has accordingly declared the mark "incontestable." Id. "An incontestable mark is presumed to be at least descriptive

23

with secondary meaning, and therefore a relatively strong mark." Sovereign Military, 809 F.3d at 1183 (quotation omitted). In this case, the parties stipulated that FIU's word mark was incontestable.

The district court observed that, viewed in isolation, the terms comprising FIU's word mark were either generic or descriptive. But, in light of its incontestable status, the court appropriately presumed that FIU's mark was relatively strong. Nonetheless, it determined that FNU had rebutted the presumption of strength by showing extensive third-party use of the mark, explaining that FNU had identified "13 other entities using the terms 'Florida' and 'University' -- all of which are aimed at the same education marketplace as FIU." Thus, the district court adjudged FLORIDA INTERNATIONAL UNIVERSITY and the attendant acronym to be "relatively weak."

On appeal, FIU argues that its word mark is "strong and distinctive," challenging the district court's conclusion on three grounds: first, FNU's evidence of third-party use was inadequate to effect the strength of FIU's mark; next, the trial court erred by focusing only on FIU's mark's "conceptual strength" and ignoring evidence of their "commercial strength"; and, finally, it could not logically have found that FIU's mark was weak in light of the court's subsequent conclusion that it was "famous" within the meaning of the Florida Anti-Dilution Act, Fla. Stat. § 495.151. We remain unpersuaded.

24

For starters, FIU attacks the district court's heavy reliance on third-party use to diminish the strength of its mark because, in its view, the evidence of third-party use was both numerically and substantively inadequate to weaken its mark. This Court has long recognized that the extent of third-party use of a mark is an essential factor in determining a mark's strength. See John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 975 (11th Cir. 1983). Indeed, we've said that a "strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties." Id. at 973-74 (quotation omitted). Thus, the number of third-party users is important, but there is no hard-and-fast rule establishing a single number that suffices to weaken a mark. Rather, in assessing the impact of third-party uses, we consider "the entire name a third party uses, as well as the kind of business in which the user is engaged." Safeway Stores, Inc. v. Safeway Discount Drugs, Inc., 675 F.2d 1160, 1165 (11th Cir. 1982).

In this case, the district court reasonably found as a fact that extensive third party use diminished the strength of FIU's word mark and acronym. Excluding FIU and FNU, twelve other higher education institutions in the state of Florida use both "Florida" and "University" in their names (and the letters "F" and "U" in their initials): Florida A&M University (FAMU), Florida Atlantic University (FAU), Florida Christian University (FCU), Florida Gulf Coast University (FGCU),

25

Florida Memorial University (FMU), Florida Polytechnic University (FPU), Florida State University (FSU), University of Central Florida (UCF), University of Florida (UF), University of North Florida (UNF), University of South Florida (USF), and University of West Florida (UWF).[5]    Indeed, eleven of these twelve universities are members of Florida's State University System, like FIU.  Twelve third-party uses can be sufficient to diminish the distinctiveness of a mark.  See AmBrit, 812 F.2d at 1539 (affording lesser protection where 8 third-party users in the same market employed similar trade dress); see also El Chico, Inc. v. El Chico Café, 214 F.2d 721, 725 (5th Cir. 1954) (finding 27 instances of third-party use of "Chico," "El Chico," and similar names "for various products and articles" was sufficient to classify "El Chico" mark as weak); Homes & Land Affiliates, LLC v. Homes & Loans Magazine, LLC, 598 F. Supp. 2d 1248, 1261 (M.D. Fla. 2009) (finding "widespread third-party use" based on 18 instances).

Considering the frequency of third-party use and in context, it seems to us that FIU operates in a crowded field of similar names.  Looking at the full name the third parties use, see Safeway Stores, 675 F.2d at 1165, all twelve of the other universities use two of the three words that FIU uses in its name.  And five of them have three-word names that differ by only one word, and acronyms that differ by

---

[5] The district court said that there were thirteen such universities, presumably because it included FIU in its total.

only one letter. And in considering the "kind of business in which the user[s] [are] engaged," id., we cannot help but observe that all of these similarly named businesses operate in the same general field that FIU occupies: post-secondary education. Moreover, all of the third-party users are located in, and target customers in the same general geographic area: Florida. In fact, one of them -- Florida Memorial University -- operates in Miami-Dade County, along with FIU and FNU. These factors amply support the district court's determination that FIU operates in a crowded field of three-word university names that involve the words "Florida" and "University," and that these names, therefore, are not particularly distinct to consumers. There was nothing in the record to suggest that potential students and others were prone to distinguish FIU's name from the others in this crowded field. Accordingly the district court's conclusion was reasonable.

Next, FIU claims that the district court erroneously disregarded evidence of its mark's "commercial strength," evaluating only its "conceptual strength." Conceptual strength evaluates a mark's placement on the spectrum of marks (arbitrary or generic), whereas commercial strength measures the marketplace's recognition value of the mark. 2 McCarthy on Trademarks and Unfair Competition ("McCarthy") § 11:83 (4th ed. 2016). It is surely true that focusing solely on conceptual strength is an "incomplete" method of analysis, since we are also required to examine "the marketplace strength of the mark at the time of

litigation or at the time registration is sought." Id. Thus, as we've explained, "even if [a] mark initially was weak, it may . . . subsequently acquire[] strength through [its owner's] promotional efforts." John H. Harland, 711 F.2d at 974 n.13. Indeed, an initially weak mark "may, by reason of subsequent use and promotion, acquire such distinctiveness that it can function as a significant indication of a particular producer as source of the goods with which it is used." Id. (quotation omitted). "Determining the strength of any mark requires weighing either or both circumstantial evidence of advertising and promotion and direct evidence of consumer recognition, such as by a survey." 2 McCarthy § 11:83.

The practical problem with FIU's argument, however, is that FIU didn't offer any direct evidence of commercial strength. To be sure, FIU has spent substantial time, energy, and effort in promoting its mark, and has continually educated students over the past 50 years under the name FIU. The parties stipulated that FIU spends approximately $15 million annually on marketing and community outreach and engagement efforts, including advertising and promoting its mark through its athletic programs, radio advertisements, its website, and by publishing FIU Magazine. But, in isolation, evidence of promotion efforts is not sufficient to establish a mark's commercial strength because it tells us precious little about the efficacy of those efforts in creating marketplace recognition of FIU's mark. Absent comparative evidence establishing that FIU has spent

28

substantially more on advertising than its competitors in the field of higher education, or "direct evidence of consumer recognition," 2 McCarthy § 11.83, FIU's promotional efforts do not establish that its mark has acquired "such distinctiveness that it can function as a significant indication of a particular" university among others in the same market. John H. Harland, 711 F.2d at 974 n. 13 (quotation omitted). There simply was not sufficient evidence of commercial strength in the record to require the district court to ignore the substantial third-party usage.[6]

FIU also claims that the district court reached inconsistent conclusions when, on the one hand, it found that FIU's word mark was relatively weak but, on the other hand, in a subsequent assessment of FIU's state law trademark dilution claim, determined that the mark was "famous" within the meaning of the Florida Anti-Dilution Act, Fla. Stat. § 495.151. Florida's anti-dilution statute provides a cause of action for owners of marks that are "famous in [Florida]" against defendants whose "use of a mark or trade name . . . is likely to cause dilution of the distinctive quality of the famous mark," and it lists eight non-exhaustive factors that the courts should consider in determining whether a mark is famous. Id. §

---

[6] Evidence of commercial strength would likely have been particularly important in this case. For example, it's difficult to imagine a more generic name for a university in Florida than "University of Florida" or "Florida State University," but few people who have turned on a television on a Saturday afternoon would think that those names lack recognition in the marketplace of post-secondary education.

29

495.151(1). As the district court recognized, courts interpreting Florida's anti-dilution statute have concluded that to be "famous" a mark must be very strong and distinctive. See, e.g., MPS Entm't, LLC v. Abercrombie & Fitch Stores, Inc., No. 11-24110-CIV, 2013 WL 3288039, at *16 (S.D. Fla. June 28, 2013) ("To be 'famous' in the context of a trademark dilution claim, '[t]he mark must have a degree of distinctiveness and strength beyond that needed to serve as a trademark; it must be 'truly prominent and renowned.'" (quoting HBP, Inc. v. Am. Marine Holdings, Inc., 290 F. Supp. 2d 1320, 1338 (M.D. Fla. 2003)); accord 4 McCarthy § 24:104 ("A trademark cannot be 'famous' unless it is 'distinctive,' but it can certainly be 'distinctive' without being 'famous.'"). In discussing FIU's dilution claim, the court found that FIU's marks were famous based on FIU's "longstanding and widespread use of the marks . . . combined with [their] federal registration."

We agree with FIU that the district court's fame finding is in some tension with its conclusion that FIU's word mark is "relatively weak," particularly because the main factor the court relied on in finding that the mark was relatively weak -- the extent of third-party use -- also cuts against a finding of fame. See Fla. Stat. § 495.151(1)(g). But we don't think this flaw in the court's reasoning proves that there's anything erroneous about the court's ultimate conclusion that FIU's mark was weak. The district court only referenced three of the statutory factors in

30

support of its fame finding -- duration and extent of use, duration and extent of advertising, and federal registration -- and ignored the other five factors identified by the state legislature in the statute. See id. § 495.151(a) (distinctiveness of mark in Florida); id. § 495.151(d) (geographic area in which mark is used); id. § 495.151(e) (trade channels); id. § 495.151(f) (degree of recognition); id. § 495.151(g) (third-party use). Moreover, the district court may not have fully considered whether FIU's mark was famous because, as we explain below, it concluded that FIU's dilution claim failed for other reasons. Quite simply, the district court's brief and unnecessary analysis of FIU's mark's fame does not cast a long shadow on the rest of its careful analysis.

In sum, we can discern no clear error in the district court's finding that FIU's word mark is relatively weak. However, relatively weak marks are still entitled to a narrow range of protection. See John H. Harland, 711 F.2d at 975. Therefore, we are also obliged to examine the other six factors in order to determine whether, as a whole, the district court's likelihood-of-confusion determination was sound.

## 2. Similarity of marks

The second factor in the likelihood-of-confusion analysis requires the factfinder to compare the plaintiff's marks with the defendant's marks and measure their similarity. Sovereign Military, 809 F.3d at 1186. The greater the similarity,

the greater the likelihood of confusion.  Id.  Two marks need not be identical to support a finding of infringement, and the key question remains whether the marks are sufficiently similar "to deceive the public."  Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, 33 (1900).  We consider the overall impression created by the marks, and do not simply compare isolated features.  Sovereign Military, 809 F.3d at 1186.  Relevant points of comparison include "the appearance, sound and meaning of the marks, as well as the manner in which the marks are used."  John H. Harland, 711 F.2d at 975.  If a trademark operates in a crowded field of "similar marks on similar goods or services," slight differences in names may be meaningful because consumers "will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other." 2 McCarthy § 11:85.

The district court acknowledged that "Florida International University" and "Florida National University" (and the acronyms FIU and FNU) are similar in sound and appearance, but determined that the difference in the meaning of the words "national" and "international" outweighed any similarity.  It explained that, in common usage, the two terms are used as antonyms to describe the domestic or overseas character of something and, therefore, they are not "so closely aligned as to create a likelihood of confusion among consumers."  Moreover, the court found, other universities use very similar acronyms and, therefore, FNU's acronym does

32

not increase the likelihood that a reasonable consumer would be confused as to the source of the services that it represents. FIU disagrees because, it argues, the names are quite similar and certain dictionaries define "national" as a subset of "international."

Again we remain unpersuaded. For starters, the parties stipulated that Merriam-Webster's On-line Dictionary classifies "international" as a "near antonym" of national. The district court reasonably attributed more weight to the meanings than to the appearance and sound of the marks, especially in a field where so many competitors have names that appear and sound similar. Moreover, in a crowded field of similar acronyms, the district court reasonably found that the addition of one more school identifying itself with an acronym containing the letters F and U would not materially add to the confusion. This is especially true in a field like post-secondary education, where the primary consumers -- potential students (and likely their parents too) -- generally spend a substantial amount of time and energy learning about their options before choosing a school and are, therefore, unlikely to be confused by similar names. See Welding Servs., 509 F.3d at 1361. Accordingly, we can find no clear error in the district court's determination that the names and acronyms were not confusingly similar.

3. Similarity of products

33

The third factor asks whether the parties' services "are the kind that the public attributes to a single source." Frehling Enters., 192 F.3d at 1338. The test is not whether the products can be readily distinguished, but rather whether the goods are "so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods." Id. The focus is on "the reasonable belief of the average consumer as to what the likely source of the goods [is]." Id. The district court recognized that almost half of FNU's students were seeking associate's degrees, which FIU does not offer, and another 21% were taking only ESL classes, which FIU generally offers only to prepare students for their full-time enrollment. Nevertheless, because FNU offers several bachelor's degree programs and one master's program that overlap with those offered by FIU, the court found that a reasonable consumer could conclude that the services provided by FIU and FNU are attributable to a similar source. The parties agree that this factor weighs in favor of FIU's infringement claim, so we accept the district court's determination.

### 4. Similarity of retail outlets and customers

The fourth factor takes into consideration where, how, and to whom the parties' products are sold. See Frehling Enters., 192 F.3d at 1339. Dissimilarities between the manner of sale and the typical customers of the parties' services lessen the possibility of confusion. Id. Direct competition between the parties is not

required for this factor to weigh in favor of a likelihood of confusion. Id. That is, the parties' outlets and customer bases need not be identical, but some degree of overlap should be present for this factor to support a finding of likelihood of confusion. Id.

The district court found that there were significant differences in the students looking to attend the two schools because: most FNU students are seeking associate's degrees or ESL programs that FIU doesn't provide; FIU targets students who are directly out of high school and seeking a four-year degree, whereas most FNU students have been out of high school for an average of ten years; and, unlike FIU, FNU doesn't require students to submit standardized test scores prior to admission. However, the court also noted that both schools offer identical bachelor's and master's degrees as well as online courses and, therefore, they have some potential overlap in prospective students. In light of these competing considerations, the court found that this factor weighed in favor of finding a likelihood of confusion, but did not merit much weight in the overall analysis. FIU says that the district court erred in discounting the significance of this factor because there is significant overlap in the two schools' potential students and their campuses are "virtually identical."

First, it seems plain to us that there simply isn't much of an overlap in the two schools' potential student bodies. It is undisputed that nearly 50% of FNU's

35

students are enrolled in an Associate of Arts or Associate of Science Program -- a type of degree that FIU does not even offer. And over 21% of FNU's students are enrolled in a developmental program for ESL. While FIU says that it, too, offers ESL programs, its programs are intended only for students "seeking to enter college or professional schools" -- a distinction the district court found meaningful. To be sure, both schools offer overlapping bachelor's and master's degrees. But 90% of FIU's bachelor's degree candidates matriculate straight from South Florida high schools, whereas most of FNU's students have been out of high school for a decade on average. Moreover, while FIU generally offers a "traditional" four-year college experience for recent graduates, which includes living on campus, almost all of FNU's students commute to class at night after work. In short, the district court reasonably found that the two schools do not "cater to the same general kinds of individuals." Safeway Stores, 675 F.2d at 1166.

We also see little resemblance in the "retail outlets" of the two schools, i.e., the campuses and websites where students can take classes. FIU has two major campuses in South Florida: the Modesto A. Maidique Campus in west Miami-Dade County and the Biscayne Bay Campus in North Miami Beach. FIU has described the Maidique Campus as a "342-acre metropolis" containing residential halls, an eight-story library, a nature preserve, an athletic stadium, and an art museum. FNU also has two main campuses in South Florida, each consisting of a

single building: the "Hialeah Campus" in Hialeah, and the smaller "South Campus," which is located approximately two miles from FIU's Maidique Campus. FNU's single-building campuses do not offer any on-campus housing for students. Considering these striking differences in the two schools' campuses, the district court reasonably concluded that potential students were unlikely to confuse an FNU single-building campus for an FIU "metropolis." It's also true that the two schools offer online courses, but they each do so through their own website, which "would dispel rather than cause confusion . . . because the websites are separate and distinct, suggesting two completely unrelated [] entities." Tana, 611 F.3d at 778. Considering these differences, we can find no clear error in the district court's decision to discount the weight of this factor.

### 5. Similarity of advertising media

Controlling law also requires that we compare the parties' advertisements and the audiences they reach. Sovereign Military, 809 F.3d at 1188. "The greater the similarity, the greater the likelihood of confusion." Id. (quotation and alteration omitted). Our cases do not require identity of advertising methods; "the standard is whether there is likely to be significant enough overlap in the [audience of the advertisements] that a possibility of confusion could result." Frehling Enters., 192 F.3d at 1340.

The district court found that there was minimal overlap in the audience of the two schools' advertising. Even though both parties advertise in the same types of printed publications, the court found that there was no evidence that any of the readers of FIU's publications were likely to also read magazines or other publications in which FNU advertises. However, the court found one aspect of overlap in the parties' advertising methods: both FIU and FNU advertise on the same South Florida radio station, WLRN, a National Public Radio member station. The court adjudged this overlap sufficient to create some likelihood that the same consumers would be exposed to both schools' marks, but, again, found this factor to merit little weight in the overall scheme of things. Again, the district court's assessment was a reasonable one. The key question in assessing similarity of advertising media is whether the parties' ads are likely to reach the same audience. The evidence tended to show substantial overlap in the <u>types</u> of advertising methods used by the parties (magazines, Internet banner ads, and print media), but, as far as we can tell, the only evidence of overlap in the <u>audience</u> was in the radio advertisements. Accordingly, the district court reasonably concluded that this factor weighed only slightly in favor of finding a likelihood of confusion.

### 6. FNU's intent

"If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact

alone may be enough to justify the inference that there is confusing similarity."

Frehling Enters., 192 F.3d at 1340; see also AmBrit, 812 F.2d at 1542.    In

examining this factor, the district court had to determine whether FNU "had a

conscious intent to capitalize on the plaintiff's business reputation, was

intentionally blind, or otherwise manifested improper intent" in adopting its new

name and acronym.  Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc., 508 F.3d

641, 648 (11th Cir. 2007) (quotations and alteration omitted).

The district court found that FNU's prior knowledge of FIU's marks was

insufficient to create an inference of improper intent, and that the prior litigation

between FIU and FNU related to FNU's name change to "Florida International

College" was not persuasive evidence of improper intent because the parties had

peacefully coexisted for more than twenty years after settling that lawsuit.

Accordingly, the court found that the intent factor weighed against finding a

likelihood of confusion.

FIU argues, in essence, that the district court drew the wrong inference from

the parties' litigation history, and that the prior trademark suit requires a

presumption that FNU acted improperly in changing its name.  We acknowledge

that FNU's shifting explanations for its name change,[7] combined with its history of

_____

[7] At the outset of this litigation, FNU contended that it changed its name to include "university" because it believed its accrediting body required the name change once FNU began (continued on next page)

choosing names similar to FIU's, could have supported a finding of wrongful intent. But, as the district court observed, the parties had peacefully coexisted for over twenty years after their prior litigation, and FNU has provided a plausible explanation for why it added the word "University" to its name. Considering these mixed indicia of FNU's intent in adopting its new name, we think that there were at least two permissible ways to view the evidence. Therefore, the district court's finding that FNU's name change was not improperly motivated was not clearly erroneous. See Anderson, 470 U.S. at 574.

### 7. Actual confusion

Evidence of confusion by actual or potential customers is, of course, the best evidence of a likelihood of confusion. Frehling Enters., 192 F.3d at 1340. "[T]he quantum of evidence needed to show actual confusion is relatively small." See Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC, 605 F.3d 931, 937 (11th Cir. 2010) (quotation omitted). In assessing the weight of evidence of actual confusion, we must consider who was confused and how they were confused: "Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight, . . . while confusion of actual customers of a business is worthy of substantial weight." Safeway Stores, 675 F.2d at 1167;

offering master's degrees. When this explanation was revealed to be false, FNU explained that it changed its name because attending a "university" is more appealing to foreign students than attending a "college."

see also Aronowitz, 513 F.3d at 1239-40 ("With regard to actual confusion, we have specifically accorded 'substantial weight' to evidence that actual customers were confused by the use of a mark as opposed to other categories of people."). We've found that even two instances of actual confusion is "worthy of some consideration" when the right people are confused in the right way. See Safeway Stores, 675 F.2d at 1167.

The parties stipulated that "[t]here has never been a single known instance during the application process where a prospective student has applied for admission to either FNU or FIU under the impression that FNU was associated with FIU." However, FIU produced evidence of two instances of alleged actual customer confusion: a July 7, 2014 email from a FedEx employee to an FIU administrator asking whether FNU "is accredited with FIU"; and a May 28, 2014 letter sent to FNU from a California high school student who requested information regarding "both admission to and programs at Florida International University" because she was investigating "the various colleges and universities [that she was] considering attending" as part of a sophomore class project. FIU also provided hearsay testimony from its Rule 30(b)(6) designee that some of its employees were "confused" by FNU's new name. And FIU submitted evidence that, on one occasion, a WLRN radio announcer who was reading an FNU advertisement said "Florida Int -- Florida National University."

41

The district court determined that the FedEx employee's email was entitled to little weight because it was unclear whether she was an actual consumer of higher education services.  It found that the high school student's letter merited greater consideration because she was a potential FIU applicant, but determined that "a sole, de minimis instance of consumer confusion is not enough to militate in favor of [] finding a likelihood of confusion."  The court did not credit FIU's hearsay evidence regarding employee confusion, and found that the broadcaster's "flub[]" was not persuasive evidence of actual confusion.  Thus, it concluded that FIU had provided insufficient evidence of actual confusion to weigh in favor of finding a likelihood of confusion.

FIU does not take issue with any of the district court's specific findings, but nonetheless asserts that its evidence of actual confusion tips this factor in favor of a finding of likelihood of confusion.  Again, we're unpersuaded and find no clear error in the district court's assessment of this factor.

First, the district court was well within its right to disregard FIU's hearsay evidence of confusion among its employees, which was no more than references by FIU's Rule 30(b)(6) representative to ambiguous statements by unidentified employees at some point in the past.  It was likewise reasonable to discount the radio announcer's error, which was, after all, the type of "[s]hort-lived" confusion by an individual "casually acquainted with [FNU that was] worthy of little

42

weight."  Safeway Stores, 675 F.2d at 1167.  We also think that the district court, as the finder of the facts, could reasonably afford little weight to the letter from the FedEx employee because there was nothing in the record that suggested she was a potential applicant for either school.  The probative value of the letter was "low because of the uncertainty about what might have prompted the inquiries," and because "the nature of [FIU and FNU's] business . . . requires that the purchasers of the services . . . be sophisticated consumers."  Welding Servs., 509 F.3d at 1361. We are thus left with the email from a single California high school student.  As an actual prospective student who was actively looking at potential college options, she was undoubtedly an "actual customer" for purposes of the likelihood of confusion analysis.  But with only a single probative instance of consumer confusion in the years since FNU's name change, the district court reasonably decided that this factor did not weigh in favor of a likelihood of confusion.

### 8.  Balancing

Having found the district court's assessment of each of the seven likelihood-of-confusion factors to be reasonable, it should come as no surprise that we find no clear error in its ultimate conclusion that FIU failed to establish a likelihood of confusion.  Three of the seven factors -- similarity of services, overlap in customers and trade channels, and similarity in advertising methods -- weigh, albeit only slightly, in favor of finding a likelihood of confusion, but the two most

important factors -- evidence of actual confusion and the strength of the mark -- do not. Moreover, FIU's burden of establishing a likelihood of confusion was higher than usual in this case because, we repeat, potential college students are relatively sophisticated consumers who are unlikely to be easily or meaningfully confused by similar-sounding university names. Considering these factors, in concert, the district court reasonably concluded that FNU's adoption of its new name and acronym did not and would not likely cause consumer confusion. We, therefore, affirm the court's denial of FIU's federal trademark claim.

## IV.

Section 43(a) of the Lanham Act creates a federal cause of action for any person injured by another's use of a mark that "is likely to cause confusion, or to cause mistake, or to deceive" as to the origin of a product or service. 15 U.S.C. § 1125(a)(1)(A). In order to prevail on a federal claim of unfair competition under § 43(a), a trademark owner "must show (1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." Suntree Techs., Inc. v. Ecosense Int'l, Inc., 693 F.3d 1338, 1346 (11th Cir. 2012) (quotation omitted). While nearly identical to the likelihood-of-confusion standard that we've already discussed for federal trademark infringement claims, § 43(a) of the Lanham Act "is broader . . . in that it covers

false advertising or description whether or not it involves trademark infringement."

Babbit Elecs., Inc. v. Dynascan Corp., 38 F.3d 1161, 1181 (11th Cir. 1994).

In the district court, FIU broadly advanced two theories of liability in support of its federal unfair competition claim: FNU's use of its new name was likely to cause people to confuse FNU with FIU; and FNU's name change, its intentional omission of its for-profit status, and its adoption of the course numbering system of Florida's state universities were all part of an attempt to falsely associate itself in the public eye with Florida's state universities. The district court rejected the first theory based on its determination that FIU had failed to establish a likelihood of confusion with respect to its trademark claim. And it rejected the false association theory because it understood our precedent to only allow FIU to pursue an unfair competition claim based on the likelihood that FNU's use of its new name would confuse consumers with FIU. While the court recognized that a significant portion of the public may be confused about FNU's affiliation with the State of Florida, it concluded that this confusion had not resulted in an appreciable increase in confusion over FNU's affiliation with FIU.

FIU advances the same two theories of unfair competition on appeal. The parties agree that FIU's first theory -- that FNU's marks create a likelihood of confusion with FIU's marks -- is coextensive with FIU's trademark infringement claim. For the reasons we've already discussed, at some length, we can find no

45

clear error in the district court's determination that FNU's marks did not create a likelihood of confusion and we, therefore, agree with the district court that FIU's first theory of unfair competition fails.

We also reject FNU's false association theory of liability, although for different reasons than were offered by the district court. In concluding that FIU could only assert an unfair competition claim based on the potential that consumers would confuse FNU with FIU, the district court relied on our statement in Suntree Technologies that an unfair competition claim requires a trademark owner to show that "the other party had adopted a mark or name that was the same, or confusingly similar . . . , such that consumers were likely to confuse the two." 693 F.3d at 1346 (emphasis added). However, in that case, we were simply reciting our longstanding definition of unfair competition, see, e.g., Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 106 F.3d 355, 358 (11th Cir.), opinion modified on reh'g, 122 F.3d 1379 (11th Cir. 1997), not addressing the distinct theory of liability asserted by FIU in this case. The district court's construction of Section 43(a) of the Lanham Act would render that cause of action wholly duplicative of a trademark infringement action for trademark holders, when in fact the language of Section 43 is much broader:

> Any person who . . . uses in commerce any . . . name, symbol, or
> device, or any combination thereof . . . , which . . . . is likely to . . .
> deceive as to the affiliation, connection, or association of such person
> with another person, or as to the origin, sponsorship, or approval of

> his or her goods, services, or commercial activities by another person
> . . . shall be liable in a civil action by any person who believes that he
> or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  This language seems to encompass FIU's false association theory that FNU has used a name, symbol (its logo), and device (the course naming and numbering system) that create the false impression that FNU is associated with the State of Florida.

However, we needn't definitively decide whether FIU's broader false association rationale falls within the scope of Section 43(a) because FIU has not explained how -- let alone pointed to any evidence establishing -- that it "is likely to be damaged" by FNU's actions associating itself with Florida public universities.  The district court reasonably credited FNU's expert testimony that, while 30% to 50% of survey respondents thought that the State of Florida or some other government entity operates FNU, less than 1% of survey respondents associated FNU with FIU.  In short, FIU has not shown how it could have been harmed by people wrongly thinking that FNU is a Florida public university, especially when any such association did not lead them to associate FNU with FIU.  Accordingly, even assuming its false association theory was valid, FIU still has failed to prove its claim.

## V.

### A.

47

The Florida trademark dilution statute provides a cause of action for owners of marks that are "famous in [Florida]" against defendants whose "use of a mark or trade name . . . is likely to cause dilution of the distinctive quality of the famous mark." Fla. Stat. § 495.151(1). The statute contains a non-exhaustive list of eight factors that we may consider in determining "whether a mark is distinctive and famous," which largely overlap with the factors employed by the federal likelihood-of-confusion analysis. See id. However, under Florida law, "[d]ilution differs from infringement in that it does not necessarily depend on either competing goods or likelihood of confusion." Great S. Bank v. First S. Bank, 625 So. 2d 463, 470 (Fla. 1993). Rather, "[a] violation of Florida's dilution statute . . . occurs where a designation resembles the highly distinctive mark of another in a manner likely to cause a reduction in the distinctiveness of the other's mark or 'tarnishes' the images associated with the other's mark." Anderson v. Upper Keys Bus. Grp., Inc., 61 So. 3d 1162, 1171 (Fla. Dist. Ct. App. 2011). In deciding whether dilution has occurred, Florida's courts "look to the distinctiveness of the two services or products, the duration and extent of [the mark's] use and advertising, and the degree of recognition by prospective purchasers." Id.

The district court found that FIU's mark was famous within the meaning of the Florida trademark dilution statute. However, it also found that FNU had not diluted FIU's mark for largely the same reasons it had rejected FIU's federal

trademark infringement claim: the marks were not similar enough to create a likelihood of dilution; FIU did not provide "compelling or persuasive evidence of [FNU's alleged] intent to piggyback on FIU's name or goodwill"; and there was no significant risk that the public would associate FNU with FIU. FIU's sole argument on appeal is that the district court should have found a likelihood of dilution for the same reasons it should have found a likelihood of confusion. Having already rejected FIU's challenges to the district court's likelihood of confusion analysis, we affirm the district court's denial of its dilution claim for the same reasons.

**B.**

FIU correctly acknowledges that its Florida trademark infringement claim (Claim Four) and its common law infringement and unfair competition claim (Claim Five) rise or fall with its federal trademark infringement and unfair competition claims. See Suntree Techs., 693 F.3d at 1345. And in Claim Six, FIU sought "cancellation" of FNU's Florida trademark under Florida Statute § 495.101, which requires cancellation of any Florida registered trademark that is "so similar" to a previously registered federal trademark "as to be likely to cause confusion or mistake or to deceive." Id. § 495.101(3)(f). FIU raises the same "likelihood of confusion" arguments in support of its cancellation claim that we've already

rejected.    Therefore, we find that the district court did not err in granting final judgment in FNU's favor on these last three claims as well.

Accordingly, we affirm the final judgment of the district court.

**AFFIRMED.**